# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DONALD R. LICHTENSTEIN, individually and as representative on behalf of a class of similarly situated persons,<br><br>     Plaintiff,<br><br>     v.<br><br>VANGUARD CHESTER FUNDS, THE VANGUARD GROUP, INC., JOHN BENDLE, MORTIMER J. BUCKLEY, CHRISTINE M. BUCHANAN, EMERSON U. FULLWOOD, AMY GUTMANN, F. JOSEPH LOUGHREY, MARK LOUGHRIDGE, SCOTT C. MALPASS, DEANNA MULLIGAN, ANDRÉ F. PEROLD, SARAH BLOOM RASKIN, JOHN E. SCHADL, and PETER F. VOLANAKIS,<br><br>     Defendants. | Case No. _____<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff Donald R. Lichtenstein brings this action against Vanguard Chester Funds; The Vanguard Group, Inc.; John Bendle; Mortimer J. Buckley; Christine M. Buchanan; Emerson U. Fullwood; Amy Gutmann; F. Joseph Loughrey; Mark Loughridge; Scott C. Malpass; Deanna Mulligan; André F. Perold; Sarah Bloom Raskin; John E. Schadl; and Peter F. Volanakis (jointly as "Defendants"), and allege as follows:

## INTRODUCTION

1.      The Vanguard Group, Inc. ("Vanguard") is the largest provider of mutual funds in the world. Founded in 1975, Vanguard was incorporated with what they call a "radical ownership structure" through which the member funds own the company instead of public investors.[1] In turn, the member funds are owned by the fund investors, meaning everyone who purchases shares of a Vanguard mutual fund is a partial owner of Vanguard itself. Vanguard touts this feature to show that the company will "focus squarely on meeting the investment needs of our clients."[2]

2.      Mutual funds, which consist of a portfolio of stocks, bonds, or other securities managed by financial professionals to generate capital gains for the shareholders of the fund, are organized as either a corporation or a trust. Regardless of the type of entity, the board of directors or board of trustees, along with officers and advisors of the mutual funds, are required to manage the fund for the benefit of all its shareholders. The Board cannot favor a particular group of investors, while disregarding and injuring other investors.

---

[1] Vanguard, https://corporate.vanguard.com/content/corporatesite/us/en/corp/who-we-are/sets-us-apart/index.html

[2] Id.

3.     Vanguard introduced their Target Retirement Funds ("Target Funds") beginning in 2003.  These Target Funds (also called "target date" funds), created as trusts, included multiple different mutual funds that investors could select depending on when they planned to retire, i.e., the Target Retirement 2030 Fund would appeal to investors who planned to retire in or around 2030.  The primary selling point was that an investor could "set it and forget it," and the Target Fund investment managers would alter the portfolio to lessen risk exposure as the target retirement date got closer.

4.     The Target Funds were stratified into two classes of funds, with limitations based on total investment.  There were Target Funds for investors with under $100 million ("Retail Funds") and Target Funds for those investing over $100 million ("Institutional Funds").  Beyond adding "Institutional" to the fund name, limiting investment based on portfolio size, and charging a lower fee; the Institutional Funds were indistinguishable from the Retail Funds in their portfolio management.  The same trustees oversaw both Retail and Institutional Funds and employed the same investment strategies.  While Vanguard owed a duty to treat all Target Fund shareholders the same, they in fact managed these funds in a way that benefited large and institutional investors, at the expense of smaller investors, the very people Vanguard was founded to serve.

5.     When the Target Funds sell assets held by the fund (called "turnover"), federal tax law requires that they distribute any capital gains to shareholders.  Investors who hold Target Funds in tax deferred accounts, like IRA's, do not incur any immediate tax liability.  Vanguard's larger investors, such as retirement plans, fall into this category.  But Vanguard also markets and sells its Target Funds directly to smaller, ordinary investors who often hold these funds in taxable accounts.  When there is turnover within the Target Fund, an investor holding fund shares in a taxable account

will incur an immediately taxable capital gain.  For these investors, if there is a significant sell-off of assets in their Target Fund, it can cause significant tax bills.

6.      Normally, turnover rates are small, but in December 2020, Vanguard triggered a mass exodus from its Retail Funds.  Vanguard decided to change its rules to permit investors with as little as $5 million in assets to buy into its Institutional Funds.  Since the Institutional Funds charge lower rates, predictably, smaller retirement plans pulled out of the Retail Funds in droves. With so many shares being sold, the Retail Funds were forced to sell assets at unprecedented rates, triggering capital gains for Retail Funds' shareholders.  The result was capital gains distributions to all shareholders, not just those selling their shares, at up to 40 times previously seen levels.

7.      Vanguard did not have to take the course of action that it did.  The trustees of the Target Funds had options that could have achieved the same end goal without creating the massive tax liabilities for their retail investor clients.  These actions were a breach of Vanguard's fiduciary duties to shareholders that can only be considered as intentional or, at best, grossly negligent.

## THE PARTIES

**Plaintiff**

8.      Donald R. Lichtenstein ("Plaintiff") is domiciled in Colorado.  He invested in the Vanguard Target Retirement 2020 Fund (VTWNX), the Vanguard Target Retirement 2025 Fund (VTTVX), and the Vanguard Target Retirement 2030 Fund (VTHRX) in a taxable account.

9.      The proposed Classes include all persons who invested in the Retail Funds and held shares in a non-tax-deferred investment account.

**Defendants**

***The Trust***

10.     Vanguard's Target Retirement Funds are organized as Vanguard Chester Funds, a Delaware statutory trust ("the Trust" or the "Chester Funds").  Its shareholders are domiciled throughout the nation.

11.     The Trust is registered with the Pennsylvania Department of State, and lists its business address as 100 Vanguard Blvd., Malvern, PA 19355.  In SEC filings, the Trust lists its business address as P.O. Box 2600, Valley Forge, PA 19482.

12.     The Trust and each of its funds, including the Institutional Funds and Retail Funds, were managed, at the relevant times, by the same group of trustees and officers.

### *The Vanguard Group*

13.     The Vanguard Group, Inc. is organized in Pennsylvania with its headquarters located at 100 Vanguard Blvd., Malvern, Pennsylvania, 19355.  Vanguard provides "investment advisory, corporate management, administrative, marketing, and distribution services" to the Trust and to the individual Target Retirement Funds.[3]

### *The Officers of the Trust*

14.     Mortimer J. Buckley is domiciled in Pennsylvania.  He served as the Chief Executive Officer, Chairman of the Board, and President of the Trust.  He also served as a trustee.

15.     John Bendl is domiciled in the United Kingdom.  During the relevant time period, he was domiciled in Pennsylvania.  He served as Chief Financial Officer of the Trust.

---

[3] Certified Shareholder Report of Vanguard Chester Funds, March 31, 2022 ("March 2022 Semiannual Report"), https://www.sec.gov/Archives/edgar/data/0000752177/000110465922066402/tm2213819d1_ncsrs.htm (last visited July 21, 2022).

16.     Christine M. Buchanan is domiciled in Pennsylvania.  During the relevant time period, she served as Treasurer of the Trust.  She now serves as the Chief Financial Officer of the Trust.

17.     John E. Schadl is domiciled in Pennsylvania.  He served as Chief Compliance Officer of the Trust.

18.     Defendants Mortimer J. Buckley, John Bendl, Christine M. Buchanan, and John E. Schadl may be collectively referred to hereafter as the "Officer Defendants."

19.     In its January 31, 2022, Statement of Additional Information for the Trust, filed with the SEC, Vanguard lists the mailing address for the Officer Defendants as P.O. Box 876, Valley Forge, PA 19482.[4]

### The Trustees of the Trust

20.     Emerson U. Fullwood is domiciled in New York.  He served as a trustee of the Trust.

21.     Amy Gutmann is domiciled in Pennsylvania or New York.  She served as a trustee of the Trust.

22.     F. Joseph Loughrey is domiciled in Indiana.  He served as a trustee of the Trust.

23.     Mark Loughridge is domiciled in Connecticut.  He served as a trustee of the Trust.

24.     Scott C. Malpass is domiciled in Indiana or Florida.  He served as a trustee of the Trust.

25.     Deanna Mulligan is domiciled in New York.  She served as a trustee of the Trust.

26.     André F. Perold is domiciled in Massachusetts.  He served as a trustee of the Trust.

---

[4] Vanguard Chester Funds, "Statement of Additional Information January 31, 2022," https://advisors.vanguard.com/pub/Pdf/sai059.pdf (last visited July 21, 2022).

27.     Sarah Bloom Raskin is domiciled in Washington, DC or Maryland.  She served as a trustee of the Trust.

28.     Peter F. Volanakis is domiciled in New Hampshire.  He served as a trustee of the Trust.

29.     Defendants Mortimer J. Buckley, Emerson U. Fullwood, Amy Gutmann, F. Joseph Loughrey, Mark Loughridge, Scott C. Malpass, Deanna Mulligan, André F. Perold, Sarah Bloom Raskin, and Peter F. Volanakis may be collectively referred to hereafter as the "Trustee Defendants."

30.     In its January 31, 2022, Statement of Additional Information for the Trust, filed with the SEC, Vanguard lists the mailing address for the Trustee Defendants as P.O. Box 876, Valley Forge, PA 19482.[5]

## JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2).  The amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and the matter is a class action in which one or more members of the proposed Class is a citizen of a State different from any Defendant.

32.     The Court has personal jurisdiction over Vanguard because its principal place of business is in Malvern, PA within the Eastern District.

33.     The Court has personal jurisdiction over the Trust because its principal place of business is in Malvern, PA within the Eastern District.

34.     The court has personal jurisdiction over the Officer Defendants and the Trustee Defendants, because the claims arose from or relate to Trust management decisions that were made

---

[5] *Id.*

and/or carried out by the Officer Defendants, the Trustee Defendants, or their agents at Vanguard's Pennsylvania headquarters. For instance, Trustee meetings occurred there, the Trustees and Officers worked with Vanguard to execute fund management decisions there, the Trustees and Officers entered into relevant contractual relationships centered there (including service contracts with Vanguard), and the mailing address of the Trustees, for Trust business, is P.O. Box 876, Valley Forge, Pennsylvania 19482. By conducting fund business in Pennsylvania, each Defendant purposefully availed itself of the privilege of doing business in the state. In addition, certain Trustee and Officer Defendants are domiciled in Pennsylvania.

35.     For all Defendants, venue is proper under 28 U.S.C. § 1391 because a substantial part of Defendants' conduct giving rise to the claims occurred at Vanguard's headquarters, located within this District. Also, certain Trustee and Officer Defendants reside in this District.

## SUBSTANTIVE ALLEGATIONS

**Vanguard's Target Retirement Funds**

36.     Vanguard's Target Retirement Funds base their investment strategy on a target retirement year. For instance, if an investor wanted to retire sometime between 2023 and 2027, she would choose the Vanguard Target Retirement 2025 Fund.

37.     The Target Funds buy and hold other Vanguard mutual funds such as Vanguard stock and bond index funds. As of May 31, 2022, the Vanguard Target Retirement 2030 Fund (VTHRX) held 100% of its investments in four different Vanguard index funds, with roughly 65% in stocks and 35% in bonds.

38.     As the target date approaches, the investment managers of the Target Funds shift the portfolio to more conservative investments (i.e., more bonds and fewer stocks) so as to lessen risk as the investor gets closer to retirement. This process, called the "glide path" of the Target

fund, reduces volatility and ensures that an investor close to retirement is less susceptible to a big sell-off in the markets.

39.     Vanguard markets its Target Funds to investors who do not want to (or do not have the time to) actively manage their portfolio.  Indeed, when Vanguard announced its ill-conceived amendment to the Institutional Funds' investment minimums, the company announced that the Target Funds were "an all-in-one solution for those without the time, willingness, or ability to build and manage their own portfolio."[6]

40.     Vanguard originally had two tiers of target date funds the: (1) Retail Funds for individuals and retirement plans with under $100 million; and (2) Institutional Funds for retirement plans with over $100 million.

41.     Both the Retail Funds and Institutional Funds had the same strategy, managers, and portfolio of investments, but the Institutional Funds charged lower management fees.

**Capital Gains and Turnover Within the Target Date Funds**

42.     When a Target Fund sells assets, federal tax law requires the fund to distribute the capital gains to its shareholders. *See* 26 U.S.C. § 852(a)(1).  Capital gains are distributed pro rata – if an investor owns 1% of the shares of the Target Fund and it realizes a $100 taxable gain, that investor will receive a taxable distribution of $1.

43.     The capital gains generated by the Target Fund could be classified as short-term or long-term capital gains, depending on how long the securities were held in the fund's portfolio. The length of time an investor held shares of the Target Fund is not determinative.

---

[6] Vanguard, "Vanguard Broadens Access to Low-Cost Institutional Target-Date Funds" ("December 2020 Press Release") https://corporate.vanguard.com/content/corporatesite/us/en/corp/who-we-are/pressroom/Press-Release-Vanguard-Broadens--Access--to-Low-Cost-Institutional-Target-Date-Funds-12-11-2.html (last visited July 21, 2022).

44.    If an investor holds Target Fund shares in a tax-deferred account, such as an IRA or 401(k), the capital gains can be reinvested into the fund without incurring any immediate tax liability.  However, if the Target Fund shares are held in a taxable account any distributions will be subject to both federal and state taxes.

45.    Depending on the investor's income, the federal tax on long-term capital gains can be up to 20%.  Short-term capital gains are taxed as ordinary income, meaning investors could face taxes up to 37% of the gain.  Even if the investor immediately reinvests gains in the same fund, if they hold the Target Fund shares in a taxable account, they still have to pay taxes.

46.    When a mutual fund buys and sells securities, this is called "turnover" within the fund.  The total amount of turnover in a given year is called the "turnover rate" and is expressed as a percentage.  The percentage is calculated by adding the value of all transactions (buying and selling), dividing by two, and then dividing by the fund's total holdings.

47.    Turnover rates in target date funds, including the Target Funds, are typically low. Mutual funds typically keep cash on hand to pay for typical redemptions, so typical redemptions do not require selling substantial assets.  Small capital gains distributions from the payment of dividends or re-balancing the portfolio to adjust risk are to be expected each year.  These distributions are usually a fraction of a percent of the overall value of the fund.

48.    Accordingly, investors can reasonably expect capital gains distributions from funds like the Target Funds to be insignificant.

49.    Most shares of Vanguard's target date funds are held in tax-deferred accounts, such as retirement plans, which are exempt from paying tax on capital gains.

50.    Vanguard also markets and sells its Retail Funds directly to individual investors. Many, but not all, of these individual investors held the Retail Funds in tax-deferred retirement accounts.  Numerous investors held the Target Funds in ordinary, taxable investment accounts.

51.    Investors who hold Target Funds in taxable accounts and sell at a profit cannot avoid capital gains tax liability by reinvesting the proceeds into other investments.  Those capital gains are taxable in the year that they are sold, preventing those investors from earning compounding returns on the money they have to pay in taxes.

52.    Investors who hold Target Funds in taxable accounts rely on the decisions of Vanguard's investment managers to keep turnover rates and capital gains low, so that the investment can build value long-term.

53.    Vanguard provides information on the (typically low) turnover rates and minimal realized capital gains of the Target Funds in the funds' prospectuses each year.  Low turnover rates and modest capital gain payouts are attractive features to an investor who is considering holding the fund in a non-tax-deferred account, since they usually mean less taxes at the end of the year.

**Vanguard Alters the Institutional Investment Threshold, Triggering a Sell-off**

54.    As one of the largest purveyors of mutual funds, Vanguard is in fierce competition with other financial industry giants to attract and keep clients.[7]  In the past, brokers charged commissions on trades and transactions, but more investment firms now charge flat fees based on the assets managed within the account.  This is particularly true for mutual funds.

55.    In December of 2020, Vanguard announced it had decided to lower the minimum investment threshold for their Institutional Funds, from $100 million down to $5 million.[8]  Seeking

---

[7] Per the December 2020 Press Release, Vanguard managed $6.3 trillion in global assets as of October 31, 2020.  *Supra*, n.6.

[8] December 2020 Press Release, *supra* n.6

to attract more investment from smaller retirement plans, in the release Vanguard noted that by lowering the investment minimums, more 401(k) and 403(b) plans could take advantage of the low expense ratio of Vanguard's Institutional Funds.  Vanguard touted these expense ratios as being 85% lower than the industry average.[9]

56.    While investors in the Retail Funds paid an expense ratio of 0.13%, the expense ratio for the Institutional Funds was 0.09%.  Smaller retirement plan managers with between $5 million and $100 million in assets, which owe a fiduciary duty to their plan participants, essentially could not resist jumping ship from the Retail Funds to the Institutional funds, where they saved around 30% of the fees they were paying.

57.    Predictably, this caused a mass exodus of qualified plans, and resulted in an unprecedented sell-off of Retail Funds shares.  In any given year, shares of the Target Funds are issued and redeemed, but the difference after the December 11, 2020, Press Release is obvious. The chart below illustrates the sell-off within the Vanguard Total Retirement 2030 Fund.[10]

---

[9] *Id.*

[10] All charts were compiled using data pulled from Vanguard Chester Funds' Annual Reports filed with the SEC, available at https://www.sec.gov/edgar/browse/?CIK=752177 (last visited July 21, 2022).

58.    From 2015 to 2020,[11] redemptions from the Vanguard Total Retirement 2030 Fund averaged around 209 million.  Offset by shares issued, the net change in shares outstanding averaged 54 million per year, and was always positive, meaning more shares were purchased than were redeemed.  In 2021, after Vanguard lowered the investment minimums, a staggering 490.4 million shares were redeemed, resulting in a net decrease of over 272 million shares outstanding. The decrease in shares outstanding was nearly triple the highest annual change since 2015.

59.    When an investor redeems shares, they are entitled to a cash payment from the fund for the value of the shares.  The value of the shares redeemed shows the hole in the Vanguard Total Retirement 2030 Fund that Vanguard had to fill by selling off investments.  In every other year since 2015, capital shares issued made up for those redeemed, but in 2021, $20 billion worth of shares were redeemed, resulting in a net decrease of over $11 billion in the 2030 Retail Fund. The

---

[11] Vanguard's financial statements run on a fiscal year from October 1 to September 30 of the year noted.  E.g., the 2021 data spans from October 1, 2020 to September 30, 2021.

chart below illustrates the extraordinary change in the value of shares redeemed (blue bars) and net decrease in asset value (red bars) in 2021.



### The Effect of the Sell-off on the Funds and Investors

60.    This exodus forced the Retail Funds to sell off a substantial portion of their assets. When these assets were sold, the Retail Funds recognized massive gains.  In any given year, a fund may or may not have to sell assets, but the magnitude of the sales required in 2021 were unprecedented.  The Vanguard Total Retirement 2030 Fund had never realized more than $285 million in net gains in any year since 2015.

61.    In 2021, because of Vanguard's management decisions regarding the Institutional Funds, the Vanguard Total Retirement 2030 Fund had to liquidate substantial assets, which resulted in a realized net gain of over $5.6 billion.  The chart below illustrates the how dramatically the sell-off and resulting net gain differed from prior years.



62.     The sale of these assets that had increased in value generated substantial capital gains that were then passed through the Retail Funds as distributions to their shareholders, including Plaintiff.  The distributions were unparalleled in their scale.

63.     From 2015 through 2021, total distributions to shareholders of the Vanguard Total Retirement 2030 Fund averaged $0.82 per share, and never exceeded $1.04.  Of those distributions, realized capital gains averaged $0.15 per share, and never exceeded $0.44.

64.     At the end of 2021, Vanguard Total Retirement 2030 Fund shareholders received a total distribution of $6.75, including $5.93 in realized capital gains.[12]

65.     The realized capital gains were more than 1,200% greater than any capital gains recognized since 2015.  The below chart illustrates the annual distributions per share from 2015 to 2022.

---

[12] Because Vanguard reports on a fiscal year, gains recognized from selling assets within the 2021 fiscal year were not distributed until the 2022 fiscal year, and reported in the March 2022 Semiannual Report, *supra*, n.3.



66.    Retirement plans and tax-deferred accounts suffered no impact from these distributions, but individual investors who held Retail Fund shares in an ordinary account were saddled with substantial tax liabilities.  These massive distributions were totally unforeseeable to investors based on Vanguard's prospectus materials.

### *Vanguard Had Options that Would Have Spared Their Clients*

67.    Vanguard did not have to alter the investment thresholds for the Institutional Funds. Viable alternatives existed that would have enabled Vanguard to reach the same goals without the resultant sell-off.

68.    Vanguard could have lowered the fees for shareholders of the Retail Funds that had at least $5 million invested.  This could be achieved by restructuring share classes, reclassifying shares, or other means.  Fee-tiering is routinely done by mutual funds, including other Vanguard funds.  Restructuring the fees would have helped Vanguard recruit and retain those larger investors as clients but would have avoided any adverse tax consequences for smaller, taxable investors.

69.    Vanguard could have merged the Retail and Institutional Funds.  Just as they could have restructured the share classes within the Retail Fund, they could have brought Institutional Fund shareholders into that tiered share structure.  This would have avoided the tax consequences that impacted Retail Fund shareholders using non-tax-deferred accounts.

70.    Vanguard's December 11, 2020 Press Release touted all the benefits for retirement plans but said nothing about the clearly foreseeable impact that this move would have on smaller investors when the retirement plans fled the Retail Funds.

### Investors With Taxable Accounts Were Damaged

71.    As previously noted, the sell-off and resulting capital gains distributions created an immediate tax liability for investors holding Retail Fund shares in ordinary accounts.  While it is true that taxes would be due on gains, regardless, at some point in time, they would not have been due in 2021, but years or even decades later.  Because these taxes had to be paid now, the investors harmed lose the earning potential that their investments would have had over those decades.  The compounding returns cannot be made up once the money is gone.

72.    Moreover, most Retail Fund shareholders set their capital gain distributions to reinvest in the fund automatically.  This means that, to pay their surprise capital gains tax bill for 2021, they had to liquidate holdings to pay the government, likely incurring further tax liability.

73.    Not only did Vanguard create completely unnecessary and massive tax consequences for thousands of their clients, but those clients also paid them to make that decision. Every investor in the Retail Funds was paying a fee based on the value of their investment in the Funds, only to be thrown under the bus so that Vanguard could better court corporate clients.

74.    The claims asserted in this case are direct claims (and not derivative claims).  Here, the injury to taxable investors was independent of any injury to the Trust (i.e., to the funds

themselves). The Trust was not injured. And most shareholders were not harmed, because most shareholders were tax-deferred. In fact, the largest non-taxable investors benefitted, since they received access to the Institutional Funds.

**Vanguard Merges the Retail and Institutional Funds**

75.     On September 28, 2021, Vanguard announced a plan to merge the Retail and Institutional Funds in February 2022 and charge an expense ratio of 0.08% across the board, for all shareholders.[13]  According to Vanguard Chairman and CEO Tim Buckley, "Vanguard will continue to innovate for clients, and our unique client-owned structure allows us to share our success with clients through lower fees."[14]

76.     Per the release, "[t]he merged funds will retain the same investment strategy, asset allocations, and glide path, informed by more than four decades of client insights and investment management expertise."[15]

77.     Vanguard noted in its March 2022 Semiannual Report that the mergers were completed on February 11, 2022 when each Retail Fund acquired all the assets of its counterpart Institutional Fund.  Moreover, this was accomplished via a "*tax-free* exchange" of Retail Fund shares for Institutional Fund shares.[16]

---

[13] Vanguard, "Vanguard to Lower Investor Costs by an Estimated $190 Million through Enhancements to its Target Retirement Series" https://corporate.vanguard.com/content/corporatesite/us/en/corp/who-we-are/pressroom/Press-Release-Vanguard-to-Lower-Investor-Costs-by-an-Estimated-190M-Through-Enhancements-to-TRFs-092821.html (last visited July 21, 2022).

[14] *Id.*

[15] *Id.*

[16] *Supra*, n.3

78.    Vanguard obtained opinions from Dechert LLP on the tax implications of merging the Retail and Institutional Funds.[17]  Consistent with the December 2020 decision's disregard for individual investors, the Dechert tax opinion only evaluates the tax implications of the mergers on the Retail Fund, the Institutional Fund, and Institutional Fund shareholders, but offers no opinion on any tax implications to Retail Fund shareholders.

79.    For those shareholders who received a massive capital gains liability due to Vanguard's earlier investment threshold decision, this added insult to injury.  Not only did they incur unprecedented tax consequences at the hands of fund managers with a fiduciary duty to manage the investments for their clients' benefit, but it is now completely evident that the investment threshold decision, less than one year prior to the merger, was absolutely unnecessary.

**Defendants' Responsibility**

80.    Vanguard, the Trust, and the Trustee and Officer Defendants owe fiduciary duties to investors whose funds they manage, including all shareholders in the Target Funds.  Vanguard claims to be "a fiduciary for more than 30 million investors," and acknowledges that "[t]he Board of Trustees [] of each Vanguard fund is responsible for fiduciary oversight of the fund."[18]

81.    That the decision to reduce the Institutional Fund investment thresholds would trigger an exodus of retirement plans from the Retail funds was clearly foreseeable.

---

[17] *See* https://www.sec.gov/Archives/edgar/data/0000752177/000113743922000131/taxopinion.htm (last visited July 21, 2022).

[18]    Vanguard, "Investment Stewardship: About our program," https://corporate.vanguard.com/content/dam/corp/advocate/investment-stewardship/pdf/perspectives-and-commentary/IS_about_our_program_092021_online.pdf   (last visited July 21, 2022).

82.    Vanguard was aware that numerous individual Retail Fund investors held shares in non-tax-deferred accounts.  The fact that these shareholders would incur immediate capital gains tax liability because of this was equally foreseeable.

83.    Further, as evidenced by the 2022 Target Fund mergers, Vanguard had other easily available options that would not have harmed these investors.

84.    Each Defendant was responsible for this decision.  Each Defendant is jointly responsible, or in the alternative, each Defendant is individually responsible.

### *Responsibility of The Trustee Defendants and The Trust*

85.    The Trustee Defendants are responsible for governance of the Trust.  Per the Trust's 2021 Annual Report "[t]he trustees of your mutual fund are there to see that the fund is operated and managed in your best interests since, as a shareholder, you are a part owner of the fund."[19]

86.    Investors holding shares in ordinary accounts are part owners just the same as investors holding shares in tax-deferred accounts and are owed the same duties by the Trustees.

87.    Additionally, the Target Funds' "trustees also serve on the board of directors of The Vanguard Group, Inc., which is owned by the Vanguard funds and provides services to them."[20]

88.    The Trustee Defendants "set broad policies for the funds" including "monitor fund operations," and monitor "regulatory compliance."  These Trustees are responsible for all Retail and Institutional funds in the Chester Trust and coordinate their management.  Accordingly, the Trustees were ultimately responsible for the sell-off decision that hurt taxable investors.

---

[19] Certified Shareholder Report of Vanguard Chester Funds, September 30, 2021 ("2021 Annual Report"), https://www.sec.gov/Archives/edgar/data/0000752177/000110465921144854/tm2132655d1_ncsr.htm (last visited July 21, 2022).

[20] *Id.*

89.     Finally, upon information and belief, the Trustee Defendants approved the decision to lower the investment threshold for the Institutional Funds.  It is certain that they had the power to take alternative action, as evidenced by that fact that when the Institutional Funds were merged into the Retail Funds, the "plan of reorganization [was] approved by the funds' board of trustees in September 2021."[21]

90.     The Declaration of Trust for the Chester Funds provides that, "[i]nvestments [in the Trust] may be accepted by the Trust from such Persons, at such times, on such terms, and for such consideration as the Trustees from time to time may authorize."[22]

### *Responsibility of The Officer Defendants*

91.     The Officer Defendants are also responsible for the harm done to taxable investors. The sell-off decision required the Officer Defendants' involvement, advice, and approval from the Trust's CEO, CFO and CCO.  The CEO would, for example, evaluate the overall strategy; the CFO would evaluate the financial and tax consequences; and the CCO would evaluate the legality. As with the Trustee Defendants, the Officer Defendants have legal duties to manage the funds for the benefit of all shareholders.

### *Responsibility of The Vanguard Group*

92.     Vanguard "manages the day-to-day operations of the funds under the direction of the board of trustees."[23]  Vanguard also serves as the investment advisor to the target date funds. In its role, Vanguard also has a legal duty to manage the funds for the benefit of all shareholders.

---

[21] March 2022 Semiannual Report, *supra*, n.3

[22]     Chester     Funds     Declaration     of     Trust, https://www.sec.gov/Archives/edgar/data/752177/000093247112001166/declarationoftrust_chesterfu.htm (last visited July 21, 2022).

[23] Vanguard Chester Funds, "Statement of Additional Information January 31, 2022," *Supra*, n.4

Vanguard is liable as it would have been involved in the sell-off decision, would have advised on it, and consented to it.

93.    Finally, Vanguard has authority to control investment minimums in all of its funds. According to the 2022 prospectus for the Chester Funds, "Vanguard reserves the right, without notice, to increase or decrease the minimum amount required to open or maintain a fund account or to add to an existing fund account."[24]

**Defendants Were Grossly Negligent, Reckless, and/or Acted in Bad Faith**

94.    Defendants had complete control over when and how investment thresholds and fees could be lowered for the Institutional Funds.

95.    The Trustee and Officer Defendants controlled the structure of both the Retail and Institutional Funds.

96.    Since the Target Funds invested in exclusively Vanguard mutual funds, Vanguard even controlled the underlying investments held by the Target Funds.

97.    The decision to lower the investment threshold for the Institutional Funds was not necessary at the time it was done and had foreseeable negative effects on an entire class of shareholders.

98.    Defendants made these decisions for their own interests, placing them above the interests of their shareholders.

99.    The decision to lower investment threshold for the Institutional Funds favored one class of shareholders over another – those with tax-deferred accounts were unaffected, while those

---

[24] Vanguard, "Vanguard Target Retirement Funds Prospectus" January 10, 2022 ("2022 Prospectus"), https://personal.vanguard.com/pub/Pdf/p308.pdf?2210177788 (last visited July 21, 2022).

holding shares in ordinary accounts faced immediate and substantial capital gains tax liability, depriving them of years, or even decades, of future returns.

100.    The changes in the fees and minimum investments for the Institutional Funds was made specifically to favor one class of shareholders to the detriment of other shareholders. Defendants' decisions benefited the retirement funds that comprise the bulk of Vanguard's assets under management, which is how they generate their fees.

101.    The foreseeable outcome of these decisions demanded careful attention to conflicts of interest and equal treatment of shareholders.

102.    Defendants owed a duty to the Target Funds' shareholders to fully explore the implications of their decisions, for *all* shareholders, before acting upon them.

103.    Defendants either disregarded their legal duties to taxable shareholders and failed to even consider the harm that would result by their decision, or they made their decision knowing that it would harm shareholders but disregarding their fiduciary duty to their shareholders.  At best this is a dereliction of duty by gross neglect.  At worst, it was a callous, intentional sacrifice of one group of shareholders to boost earnings.

104.    Regardless of the explanation, Defendants had all the information they needed readily at their disposal and the means to gather more information if needed, as evidenced by the 2021 merger of the funds, but Defendants willfully disregarded their duties.

105.    Even if Defendants' intention when they decided to lower the Institutional Funds' investment threshold to $5 million was only to attract new clients from other funder providers, unprecedented sell-off was not just foreseeable, it was certain.  Just as Defendants owe fiduciary duties to their shareholders, it is inconceivable Defendants were unaware that retirement plan

sponsors owe fiduciary duties to their plan participants and would be duty-bound to jump from the Retail Funds to the Institutional Funds.

106.    Each Defendant knows that many retail investors hold target date funds in taxable accounts.

107.    Under Defendants' direction Vanguard markets and sells its Target Funds directly to consumers, including consumers that use taxable accounts.

108.    To comply with tax reporting, Vanguard must track what types of accounts (taxable or tax-deferred) hold their Target Funds.

109.    The Target Funds' prospectuses, advise investors of average turnover rates and other tax implications, showing that they knew shareholders held shares in taxable accounts.  The 2022 Prospectus states that "[a] higher portfolio turnover rate may indicate higher transaction costs and may result in more taxes when Fund shares are held in a taxable account."[25]

110.    Furthermore, each Defendant knows that tax laws require target date funds to distribute any capital gains it realizes to its shareholders as cash.  The 2022 Prospectus also states that "[t]he Fund's distributions may be taxable as ordinary income or capital gain.  If you are investing through a tax-deferred account, such as an IRA or an employer-sponsored retirement or savings plan, special tax rules apply."[26]

111.    The harm to shareholders holding Target Fund shares in taxable accounts was foreseeable, obvious, and (undeniably) known to Defendants.

112.    Finally, even if Defendants' December 2020 decision was made without knowing how taxable accounts would be affected, Defendants had the power to reverse or delay their

---

[25] *Id.*

[26] *Id.*

decision to protect shareholders, but instead chose to wait until over $20 billion was drained from the Retail Funds, sealing ordinary shareholders' fate.

**Plaintiff Was Harmed by Defendants' Actions**

113.    Plaintiff held shares of the Vanguard Target Retirement 2020 Fund (VTWNX), the Vanguard Target Retirement 2025 Fund (VTTVX), and the Vanguard Target Retirement 2030 Fund (VTHRX) in one or more taxable accounts during the relevant timeframe.

114.    Plaintiff suffered immediate capital gains tax liability caused by the natural and foreseeable consequences of Defendants' decision to lower the investment threshold for the Institutional Funds.

115.    For the 2021 tax year, Plaintiff realized a capital gain from distributions from the Target Funds in excess of $325,000.  This resulted in taxes due to the IRS and the State of Colorado of over $100,000, solely because of distributions from the Target Funds.

116.    In addition to his tax liability, the IRS levied penalties and fees against Plaintiff for failure to pay estimated taxes on his 2021 capital gains.

117.    Plaintiff is also being forced to liquidate approximately $100,000 to pay quarterly estimated tax payments for 2022, as assessed by the IRS and the State of Colorado based on the extraordinary 2021 capital gains.

118.    Plaintiff paid Vanguard management fees, which were unjust by virtue of the fact that Defendants managed the Target Funds for the benefit of other shareholders and themselves, while causing him unnecessary expense.

119.    Plaintiff seeks fair compensation for the harm done to him and other shareholders who held Retail Fund shares in non-tax-deferred accounts.  This harm includes money immediately lost, as well as future returns that Plaintiff would have earned had he not been forced to liquidate

assets to pay capital gains taxes on distributions from the Target Funds and estimated tax payments triggered by those gains.

120.    Across all taxable shareholders, that harm is hundreds of millions of dollars or more.

121.    Plaintiff also seeks an injunction forbidding Defendants from taking actions that trigger additional selloffs or that further harm taxable shareholders in its Target Funds.

122.    Despite being harmed by Vanguard, Plaintiff and Class Members whose shares have appreciated in value cannot sell the funds without incurring additional capital gains tax liability. Plaintiff and Class Members are thus vulnerable to future Vanguard decisions that trigger more selloffs or otherwise injure taxable shareholders in the Retail Funds.

123.    This risk is concrete and imminent, because Vanguard has already shown a disregard for its taxable shareholders.

## CLASS ACTION ALLEGATIONS

**Classes Defined**

124.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on his own behalf and as representative of the following Class:

> All U.S. shareholders of Vanguard's Target Retirement Funds who held these funds in taxable accounts and who received 2021 capital gains distributions from the Retail Funds (the "National Class").

125.    Plaintiff additionally brings certain claims pursuant to Rule 23 of the Federal Rules of Civil Procedure, on his own behalf and as representative of the following Subclass:

> All residents of Colorado who were shareholders of Vanguard's Target Retirement Funds who held these funds in taxable accounts and who received 2021 capital gains distributions from the Retail Funds (the "Colorado Subclass").

126.    The following people are excluded from the Class and the Colorado Subclass:

(1) any Judge or Magistrate Judge presiding over this action and the members of their family; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parent entities have a controlling interest and their current employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel, and their experts and consultants; and (6) the legal representatives, successors, and assignees of any such excluded persons.

**Rule 23(a)**

### *Numerosity*

127.    Members of the proposed Class and Colorado Subclass (together the "Classes") are so numerous that joinder is impractical.  Plaintiff believes that there are at least thousands, if not tens of thousands, of Class Members.

### *Commonality*

128.    There are questions of law and fact common to the proposed Classes.  Common questions of law and fact include, without limitation:

- Whether Defendants violated their fiduciary duties;

- Whether Defendants knew or should have known the impact of their December 2020 decision to lower the Institutional Funds investment minimum;

- Whether Defendants violated applicable consumer protection statutes;

- Whether Defendants' violations harmed Class Members; and

- What damages are needed to compensate Class Members.

### *Typicality*

129.    Plaintiff's claims are typical of other Class Members.  Plaintiff, like all Members of the putative Classes, is an investor in Vanguard's Retail Funds who held his investment in a

non-tax-deferred account that incurred 2021 capital gains tax liability due to the unprecedented distributions from the Funds.

130.    The defenses that Defendants may raise against Plaintiff are typical of the defenses that would be raised against other Class Members.

### *Ascertainability*

131.    The identity of every Class Member can be obtained from Vanguard's investment records.

### Rule 23(b)(2)

132.    This action is appropriate as a class action pursuant to Rule 23(b)(2).  Plaintiff seeks injunctive relief and corresponding declaratory relief for the Classes.  Defendants have acted in a manner generally applicable to each Member of the Classes by managing the Vanguard Target Date Finds in such a manner as to favor the interests of larger institutional investors over those of smaller, taxable retail investors, in breach of their fiduciary duties to Class Members.

133.    Defendants' wrongful actions, if not enjoined, will subject Plaintiff and Class Members to enormous continuing future harm and will cause irreparable injuries to such shareholders. The adverse financial impact of Defendants' unlawful actions is continuing and, unless preliminarily and permanently enjoined, will continue to irreparably injure Plaintiff and the Class Members.

### Rule 23(b)(3)

134.    This action is also appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

135.    The above-listed questions of fact and law common to the Classes predominate over any individualized questions affecting only individual Members.

136.    A class action is superior to individual actions because litigating each individual Class Member's claim could result in thousands, or even tens of thousands, of independent actions, each of which would turn on the same questions of law and fact presented here.

137.    Beyond inefficient use of judicial resources, separate actions brought by individual Members could likely result in inconsistent verdicts.

138.    Some Class Members likely have sufficiently small investments in the Funds, such that pursuing an individual action is not financially feasible in light of their potential damages, meaning they would be denied any relief without the class action.  Concentrating the claims of all Class Members in a single forum will conserve judicial resources and is unlikely to present difficulties in managing the action, considering a single course of conduct by Defendants affected all Class Members.

## CLAIMS FOR RELIEF

### COUNT ONE

**Breach of Fiduciary Duty**
**(Against all Defendants on Behalf of the National Class)**

139.    Plaintiff incorporates by reference and realleges the allegations contained in paragraphs 1 through 138 above, as if fully set forth herein.

140.    Plaintiff brings this claim individually and on behalf of the National Class.

141.    As Trustees and Officers of the Chester Funds, the Trustee Defendants and Officer Defendants owed fiduciary duties to Plaintiff and Class Members, including the duties of care, loyalty, and good faith.

142.    As the investment advisor and manager of the Chester Funds, Vanguard owed fiduciary duties to Plaintiff and Class Members.

143.    As explained in detail above, each Defendant breached their fiduciary duties in connection with the December 2020 sell-off decision.

144.    Defendants breach of their fiduciary duties was either grossly negligent and reckless, or done willfully in bad faith.

145.    Defendants grossly and recklessly breached their duty of care by disregarding their duty to taxable investors, failing to consider how the decision would harm taxable investors, and failing to consider other options that would achieve the same goals without this harm.

146.    Alternatively, Defendants acted willfully and in bad faith, by recognizing, and consciously disregarding, the harm to taxable investors, because Defendants placed the interests of larger institutional investors over the interests of smaller, ordinary investors.

147.    Defendants sought to placate the interests of larger institutional investors because, by virtue of Vanguard's fee structure, the larger institutional accounts generate more revenue for Vanguard.  Defendants' actions were self-serving, in violation of their duty of loyalty to taxable investors in the Retail Funds.

148.    In addition, or in the alternative, Vanguard aided and abetted the Trustee and Officer Defendants in breaching their fiduciary duties.  As the manager and investment advisor to the Trust, Vanguard knew that the Trustee and Officer Defendants were breaching their fiduciary duties, in the way alleged in detail above, and provided substantial assistance in carrying out this breach.

149.    These breaches were a direct and proximate cause of harm and damage to Plaintiff and Class Members.

150.    As described in detail above, Defendants acted with conscious disregard and reckless indifference to the rights of Plaintiff and Class Members.

## COUNT TWO

### Gross Negligence
### (Against all Defendants on Behalf of the National Class)

151.    Plaintiff incorporates by reference and realleges the allegations contained in paragraphs 1 through 138 above, as if fully set forth herein.

152.    Plaintiff brings this claim individually and on behalf of the National Class.

153.    As Trustees and Officers of the Chester Funds, the Trustee and Officer Defendants owed a duty of care to Plaintiff and Class Members.

154.    As the investment advisor and manager of the Chester Funds, Vanguard also owed a duty of care to Plaintiff and Class Members.

155.    Each Defendant grossly deviated from the standard of care when they approved and implemented the December 2020 decision to lower the investment minimum for the Institutional Funds.

156.    Each Defendant was indifferent to their duty to taxable investors and failed to perform this duty, with awareness and reckless disregard of an extreme risk of foreseeable harm to Plaintiff and Class Members.

157.    Defendants' gross negligence was a direct and proximate cause of harm and damage to Plaintiff and Class Members.

## COUNT THREE

### Breach of the Covenant of Good Faith and Fair Dealing
### (Against all Defendants on Behalf of the National Class)

158.    Plaintiff incorporates by reference and realleges the allegations contained in paragraphs 1 through 138 above, as if fully set forth herein.

159.    Plaintiff brings this claim individually and on behalf of the National Class.

160.    A contract was formed between (a) Plaintiff and Class Members, and (b) the Trust and Trustee and Officer Defendants, which included the Chester Funds Declaration of Trust.  That agreement states that it was "entered into … by the Trustees" and that "[e]very Shareholder by virtue of having become a Shareholder shall be held to have expressly assented and agreed to the terms."

161.    The contract provided the Trust and Trustee and Officer Defendants with discretion to make fund management decisions, including merging funds, altering investment minimums, and adjusting fees.

162.    This discretion included an implied duty of good faith and fair dealing.

163.    As alleged in detail above, these Defendants failed to exercise their discretion in good faith, in connection with the December 2020 decision to lower investment minimums in the Institutional Funds.

164.    Plaintiff reasonably expected that the Trustee and Officer Defendants would use their discretion to manage the Trust so that all shareholders would be treated equally and that certain shareholders' interests would not be harmed for the benefit of the Trust or another segment of shareholders.

165.    Plaintiff was subjected to unequal treatment because of the December 2020 decision to lower the investment minimums in the Institutional Funds.

166.    The December 2020 decision to lower the investment minimums in the Institutional Funds benefited larger institutional shareholders, as well as the Trust, at the expense of Plaintiff and the Class Members' reasonable expectations from their investment.

167.    Each Defendant acted unreasonably and frustrated the benefits of the bargain that Plaintiff and Class Members reasonably expected.

168.    Defendants' breach was a direct and proximate cause of harm and damage to Plaintiff and Class Members.

## COUNT FOUR

### Unjust Enrichment
### (Against all Defendants on Behalf of the National Class)

169.    Plaintiff incorporates by reference and realleges the allegations contained in paragraphs 1 through 138 above, as if fully set forth herein.

170.    Plaintiff brings this claim individually and on behalf of the National Class.

171.    This equitable claim is asserted in the alternative if Plaintiff and Class Members lack an adequate remedy at law.

172.    Plaintiff and Class Members paid management fees that were used to pay the Trustee and Officer Defendants, and Vanguard, in exchange for managing the relevant funds with due care and in good faith.

173.    As alleged in detail above, Defendants failed to manage the funds with due care and in good faith.

174.    In this way, Defendants received a direct and unjust benefit, at the expense of Plaintiff and Class Members.

## COUNT FIVE

### Violation of Colorado Consumer Protection Act
### § 6-1-101, *et seq.*
### (Against all Defendants on Behalf of the Colorado Subclass)

175.    Plaintiff incorporates by reference and realleges the allegations contained in paragraphs 1 through 138 above, as if fully set forth herein.

176.    Plaintiff brings this claim individually and on behalf of the Colorado Subclass.

177.    Colorado's Consumer Protection Act prohibits unfair or deceptive trade practices.

33

178.    More specifically, the Act states that "[a] person engages in a deceptive trade practice when, in the course of the person's business … the person … [e]ither knowingly or recklessly engages in any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice." Colo. Rev. Stat. Ann. § 6-1-105 (West).

179.    The Act defines a "Person" as "an individual, corporation, business trust, estate, trust, partnership, unincorporated association, or two or more thereof having a joint or common interest, or any other legal or commercial entity." Colo. Rev. Stat. Ann. § 6-1-102 (West)

180.    Each Defendant qualifies as a Person as defined in the Act.  Collectively, all Defendants qualify as Persons under the act because they acted having a joint or common interest.

181.    Each Defendant, individually and collectively, was acting in the course of their business when they committed the acts that form the substance of this claim.

182.    As previously alleged, each Defendant acted either knowingly or recklessly when they approved the December 2020 decision that forms the substance of this claim.

183.    Defendants' December 2020 decision treated investors holding shares in taxable accounts, including Plaintiff and all Colorado Subclass Members, unfairly.

184.    Defendants' disclosures in the Target Funds' prospectuses were materially misleading, in that they understated or failed to fully disclose that Defendants could take such action as the December 2020 decision and create massive tax liability if investors held shares in taxable accounts.

185.    Defendants' statements that the investor "owners" of Vanguard's Funds were the "sole focus" of Defendants' investment decisions were false and misleading, as evidenced by the fact that the December 2020 decision benefited Defendants and larger institutional investors, at Plaintiff and the Colorado Subclass's expense.

186.    Defendants' December 2020 decision to lower the investment minimums for the Institutional Funds caused substantial injury to Plaintiff and Colorado Subclass Members.

187.    The harm was not outweighed by any countervailing benefits to consumers or to competition, as evidenced by the fact that Defendants later took action that provided the same benefits to all Target Fund investors, which would have done no harm to Plaintiff or Colorado Subclass Members if originally done instead of the December 2020 decision.

188.    Plaintiff and Colorado Subclass Members could not have reasonably avoided this injury, as they had no control over Defendants' decision (nor warning of it).

189.    Defendants' violation of their fiduciary duties was a public wrong, committed against not only Plaintiff but all Members of the Colorado Subclass, and had a significant impact on the investing public.

190.    Defendants' December 2020 decision was made in bad faith.

191.    Defendants' unfair conduct was a direct and proximate cause of harm and damage to Plaintiff and Colorado Subclass Members.

## **PRAYER FOR RELIEF**

192.    Plaintiff seeks the following relief for himself and for the Classes:

- An order certifying the asserted claims, or issues raised, as a class action;

- A judgment in favor of Plaintiff and the proposed Classes;

- Damages, including statutory, enhanced, or punitive damages where applicable;

- An injunction prohibiting Defendants from further harming Class Members;

- Restitution;

- Disgorgement, and other just equitable relief;

- Pre- and post-judgment interest;

- Reasonable attorneys' fees and costs, as allowed by law; and

- Any additional relief that the Court deems reasonable and just.

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted,

Dated: July 25, 2022

/s/
**GOLOMB, SPIRT, GRUNFELD, P.C.**
Richard M. Golomb (PA Bar No. 42845)
Kenneth J. Grunfeld (PA Bar No. 84121)
Kevin W. Fay (PA Bar No. 308252)
1835 Market Street, Suite 2900
Philadelphia, PA 19103
Tel:    (215) 985-9177
Fax:    (215) 985-4169
rgolomb@golomblegal.com
kgrunfeld@golomblegal.com
kfay@golomblegal.com

**BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.**
W. Daniel "Dee" Miles, III
  *(pro hac vice pending)*
James B. Eubank
  *(pro hac vice pending)*
218 Commerce Street
Montgomery, Alabama 36104
Tel:    (334) 269-2343
Fax:    (334) 954-7555
Dee.Miles@BeasleyAllen.com
James.Eubank@BeasleyAllen.com

*Counsel for Plaintiff*